IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 10, 2017 Session

FILED

01/12/2018

Clerk of the
Appellate Courts

## STATE OF TENNESSEE v. MARIO DONTE KEENE

**Appeal from the Criminal Court for Greene County**
No. 14CR340      John F. Dugger, Jr., Judge
_____

**No. E2017-00316-CCA-R3-CD**
_____

The Greene County Grand Jury indicted the Defendant, Mario Donte Keene, on four counts of felony murder, one count of especially aggravated robbery, and one count of especially aggravated kidnapping, all in connection with the death of the victim, Donald Gunter.  A jury convicted the Defendant as charged, and the trial court sentenced the Defendant to an effective sentence of life.  On appeal, the Defendant argues that the evidence was insufficient for a rational juror to have found him guilty beyond a reasonable doubt of felony murder, especially aggravated robbery, and especially aggravated kidnapping.  The Defendant also asserts that the State committed prosecutorial misconduct in its closing arguments, warranting a new trial.  After a thorough review of the facts and applicable case law, we affirm the Defendant's convictions but remand the case for entry of amended judgments merging counts two, three, and four into count one.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed
and Remanded**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

J. Russell Pryor, Greeneville, Tennessee, for the appellant, Mario Donte Keene.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Dan E. Armstrong, District Attorney General; and Cecil Mills, Jr., and Ritchie Collins, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Factual and Procedural History

On March 23, 2015, the Greene County Grand Jury charged the Defendant by presentment with the following offenses:

| Count | Indicted Offense |
|-------|------------------|
| One | First degree felony murder in the perpetration of or attempt to perpetrate a robbery |
| Two | First degree felony murder in the perpetration of or attempt to perpetrate a kidnapping |
| Three | First degree felony murder in the perpetration of or attempt to perpetrate a theft |
| Four | First degree felony murder in the perpetration of or attempt to perpetrate a burglary |
| Five | Especially aggravated robbery |
| Six | Especially aggravated kidnapping |

*The State's Proof*

Amanda Harris, who was charged with felony murder for her participation in the victim's death, testified at trial that, prior to her participation in the offenses at issue, she was addicted to crack cocaine and Xanax. She stated that she had taken drugs since she was in the eighth grade and that she had previously been convicted of theft, domestic violence, and reckless endangerment with the use of a deadly weapon. Ms. Harris stated that she lost custody of two of her children because they were born with drugs in their systems. She explained that she met the victim, Donald Gunter, in early 2013 through a friend. She frequently spent the night at the victim's house and exchanged sexual favors for money or pills. Ms. Harris was aware that the victim had a bad eye, but she was not aware of his heart problems or other health conditions. Ms. Harris testified that she met the Defendant approximately two weeks before the offenses occurred, she was in a relationship with the Defendant, and they did drugs together. The Defendant knew that Ms. Harris obtained money from other men. She stated that the Defendant did not know the victim personally, but the Defendant knew that Ms. Harris could get money from the victim.

On February 10, 2014, Ms. Harris and the Defendant were living at a motel when they ran out of drugs. She explained that she was "dope sick" and that her body hurt, she had cold chills, and she was agitated. She further explained that she needed to take Xanax or "roxies" to get rid of the "dope sick" feeling. They tried to contact Ms. Harris'

family friend, Jerry Moore, to ask for money to purchase drugs, but they were unable to reach him. Ms. Harris and the Defendant drove in the Defendant's gold Cadillac to Mr. Moore's house; Ms. Harris knocked on his door, but he was not there. When Ms. Harris returned to the vehicle, the Defendant told her to call another man that she could get money from, so she called the victim. Ms. Harris told the victim that she was "dope sick" and needed drugs or money, and he agreed to meet her at a Sonoco gas station. Ms. Harris drove to the Sonoco with the Defendant in the back seat because she knew that, if the victim saw the Defendant, the victim would not give her money. Ms. Harris waited for the victim to arrive at the Sonoco for twenty to thirty minutes, but the victim did not arrive. Ms. Harris then drove to the victim's home with the Defendant still in the back seat. She stated that she planned to go into the victim's house, tell him that she was "dope sick," and ask for money or pills. She noted that the Defendant always carried a knife and a "metal stick[] with a ball on the end of it" for his protection because he sold drugs.

When Ms. Harris arrived at the victim's house, the victim came out onto his porch and smoked a cigarette with Ms. Harris. Ms. Harris told the victim that she was "dope sick," and the victim gave her a pill. Ms. Harris and the victim attempted to have sex in the victim's living room but were unable. She stated that the victim wanted to give her money so that she could buy drugs, but he wanted her to come back and spend the night with him so that she "could pay sexual favors for the money that [she] was getting." She then went into the bathroom, smoked a cigarette, and texted the Defendant that she was "going to take the money out of [the victim's] pocket" and asked the Defendant to "text [her] back and say okay." She then informed the victim that she needed to leave to meet a friend to purchase drugs. Ms. Harris and the victim again attempted unsuccessfully to have sex, and Ms. Harris again went to the bathroom and texted the Defendant that she was "going to take [the victim's] wallet" but that the victim did not know what vehicle Ms. Harris had driven to his house, so the Defendant needed to "be ready[.]" The Defendant did not respond to either of her text messages. Ms. Harris returned to the victim's living room, and the victim offered to give her twenty dollars. Ms. Harris asked for more money, but the victim said that he was afraid that she would not return after she purchased drugs. Ms. Harris testified that the victim "had the money in his hand and [she] just grabbed the money out of his hand and [she] ran to the door."

As Ms. Harris attempted to leave the victim's house, the victim grabbed her jacket and her hair. She slid on the welcome mat on the victim's porch, fell, and screamed. She stated that the Defendant appeared and hit the victim "somewhere in the face[]" with his "stick." The victim "staggered," and the Defendant "grabbed [the victim] by the back of the shirt[.]" Ms. Harris got up, and the Defendant dragged the victim into the residence. Ms. Harris testified that the Defendant "put [the victim] down on the floor in the living room" and asked "What else does the motherf****r got that we can take[?]" Ms. Harris

asked to go, but the Defendant "had his knee in between [the victim's] shoulder blades[.]" The Defendant asked Ms. Harris to get something that he could use to tie up the victim. Ms. Harris ran into the victim's bedroom and "grabbed [her] knife and [she] cut the string of the blinds[.]" She ran back into the living room, grabbed a blanket from the couch, and gave the blind string and blanket to the Defendant. The Defendant tied the victim's hands while Ms. Harris attempted to restrain the victim's feet. The Defendant hit the victim twice because the victim would not give the Defendant his hand. Ms. Harris stated that, when the Defendant got the victim's hands "looped up[,]" the Defendant ran into the victim's bedroom while she ran out the front door. She looked for the victim's money that she dropped when the victim grabbed her, but she did not look for anything in the victim's house or attempt to stop the Defendant. The Defendant exited the victim's house with "a bag[.]" Ms. Harris then went back into the victim's house to cover the victim with a blanket because the victim did not have any clothing on and it was cold. Ms. Harris stated that the victim was lying face down when she last saw him.

The Defendant drove away with Ms. Harris in the passenger seat. When Ms. Harris began to panic that they had possibly killed the victim, the Defendant stopped driving and told her to say nothing and forget that anything had happened. When they stopped on a bridge, the Defendant handed the victim's phone to Ms. Harris, and she broke it. She stated that the Defendant threw "cards and papers and that phone[]" off the bridge. Ms. Harris and the Defendant drove to an apartment complex where the Defendant used the money that Ms. Harris took from the victim to purchase drugs. The Defendant and Ms. Harris returned to their motel room and smoked crack. Ms. Harris noticed some blood on the top of the Defendant's left shoe and panicked, so she changed her clothing at the motel. The Defendant and Ms. Harris then drove to the Defendant's mother's residence, where the Defendant changed his clothing while Ms. Harris stayed in the vehicle. When the Defendant returned to the vehicle, he put "a little shoe box and a bag" in the back seat of the vehicle. The Defendant and Ms. Harris then drove to another bridge where she "threw the items off of that bridge."[1]

The Defendant and Ms. Harris then returned to their motel room to do drugs, and the Defendant eventually fell asleep. Later, Ms. Harris took money to a friend's room, and she and the friend left the motel to purchase drugs. Ms. Harris and her friend returned to the friend's motel room and used the drugs that they had purchased. At some point, the Defendant knocked on the door of the friend's motel room and asked Ms. Harris to return to their room. Ms. Harris refused to leave and said, "What are you going to do, cut me and kill me, too[?]" In response, the Defendant cut Ms. Harris' jacket.

---

[1] It is unclear from the record what items Ms. Harris threw off this bridge.

At some point during the evening of February 11, the Defendant told Ms. Harris to call the police station to determine whether the police had taken out warrants against them. Ms. Harris refused to call the police station. At this time, the Defendant invented a story to tell the police about the events at the victim's house if they were questioned. The Defendant told Ms. Harris to say that the Defendant and Ms. Harris took a girl, "Jamie Jamison," whom they met at a club, to the victim's house.

At some point later, Ms. Harris' father picked her up, but she and her father were stopped by a detective. The detective transported Ms. Harris to the Greene County Sheriff's Department, where she gave two statements. In her first statement, she "gave them a story about Jamie Jamison[,]" which she later admitted was a lie. Ms. Harris was charged with first degree felony murder. She pled guilty to second degree murder and received an agreed upon sentence of twenty-five years at 100% on the condition that she would testify truthfully at the Defendant's trial. Ms. Harris testified that she did not intend to kill the victim when she drove to his house. She also stated that she did not know what the Defendant intended to do before she drove to the victim's house.

Tina Morgan testified that she lived on Old Mountain Road near the victim's residence. She explained that "[t]here was one house separating [her] house from [the victim's], but you couldn't see [the victim's house] for the woods." Ms. Morgan stated that she had known the victim her whole life and that in February 2014, she had been dating the victim for two years while he was separated from his spouse. She explained that the victim had cancer in one eye, which was sewn shut. The victim had also undergone a double hip replacement and open heart surgery, and he had a pacemaker with a defibrillator implanted. Ms. Morgan also noted that the victim had restless leg syndrome and "didn't have any balance." She stated that she saw the victim on February 10, 2014, when the victim came to her residence to give her a shirt. He was wearing "a regular button-up shirt, blue jeans[,]" shoes, and a coat. The victim left her residence between 11:00 and 11:30 p.m. Ms. Morgan attempted to call the victim the next morning between 11:00 and 11:30 a.m. but was unable to reach him. Ms. Morgan became worried about the victim so she and another acquaintance drove to the victim's residence and observed the victim's vehicle in the driveway. Ms. Morgan walked up onto the victim's back porch and knocked on the door; when she opened the door, she saw the victim "laying in the floor . . . without any clothes." Ms. Morgan checked to see if the victim had a pulse and then called 911. She observed that the couch that the victim regularly slept on was "in disarray" and that the victim's "black and white leopard skin throw that was an electric blanket" was on the floor instead of the couch. Ms. Morgan saw that the victim's legs were tied with string from window blinds, which were missing from the victim's bedroom window. She noted that the victim always made up the bed in his bedroom, but she observed that the bed was "in disarray on one side like someone had flipped it up and [had] been [pillaging] through it and looking under things." Ms.

Morgan also noted that the victim kept a baseball bat behind the back door for protection. As she left the victim's residence, Ms. Morgan observed a gold cross that she had given the victim laying on the front porch. She stated that the victim wore the cross daily.

On cross-examination, Ms. Morgan stated that the victim had one phone and that his phone did not ring while he was at her house on the evening of February 10, 2014. She denied that the victim was a "kingpin at drugs" and asserted that the victim had worked and owned a trailer park to support himself and his family. However, she admitted that the victim "did sell drugs, the pain pills, . . . every now and then[.]" She stated that, early in her relationship with the victim, he told her that women had offered to have sex with him in exchange for pills, but she did not know if the victim actually exchanged pain pills for sex. Ms. Morgan acknowledged that people frequently came and went from the victim's residence, and she agreed that the majority of these individuals were younger women. She explained that people frequently came to the victim's house asking for a loan. Ms. Morgan stated that the victim "might have been on Plavix."

Dr. Karen Cline-Parhamovich testified that she was formerly the Chief Medical Examiner for the State of Tennessee. After the trial court declared Dr. Cline-Parhamovich an expert in the field of forensic pathology, she testified that she conducted an autopsy on the victim's body on February 12, 2014, and prepared a report that set out her findings and conclusions. Dr. Cline-Parhamovich stated that the victim was wearing only a shirt and two socks when she began her examination and that

> his hands were tied tightly behind his back with an electrical cord, like a white electrical cord, and . . . there was a thinner cord that looked like it might be[] . . . from a mini blind[] . . . tied around part of his lower legs, and then he was hogtied because the . . . thin cord was attached to the ligatures that were around his hands and wrists.

After she removed the ligatures, she noticed that the bindings had left "intersecting linear impressions that were consistent with the . . . electrical cord that [she] removed from . . . around [the victim's] hands." The victim also had contusions, or bruising around the ligature marks, which indicated that the victim was still alive when the marks formed.

Dr. Cline-Parhamovich testified that the victim suffered a blunt-force injury to his head; the victim had some "irregular contusions" on his right forehead, some skin tears and partial skin avulsions on the right side of his nose, partial skin avulsions and abrasions around his right eye, a small contusion on his upper lip, and clusters of abrasions on the top of his head starting on the front and moving towards the back in a pattern. Dr. Cline-Parhamovich explained that "some of the [victim's] injuries caused

bleeding on the inside surface between the scalp and the skull." The victim also had a "linear, horizontal, red abrasion" on the front of his neck. Dr. Cline-Parhamovich also observed a bruise on the victim's "middle upper chest" that "went deep to the underlying . . . subcutaneous tissue[.]" The victim had two fractured ribs and bleeding in the muscles between some of the ribs. Dr. Cline-Parhamovich stated that blunt-force trauma caused the victim's internal bleeding. She also observed two abrasions on top of the victim's defibrillator, an abrasion on the left side of the victim's chest and bleeding in the subcutaneous tissue under this abrasion.

Dr. Cline-Parhamovich also identified contusions and abrasions on the victim's body. Dr. Cline-Parhamovich opined that the victim's patterned bruises on his left thigh and the top of his head were consistent with "a long cylindrical object." She examined the external surface of the victim's heart and observed that it was large, dilated, and "had a lot of scar tissue overlying it."[2] Dr. Cline-Parhamovich concluded that the victim "had very bad heart disease." She explained that, when an individual with a bad heart, like the victim, was in a stressful situation, the individual would "get a dump of stress hormones that [would] cause the blood pressure to rise . . . ." This increase in blood pressure in a heart with scar tissue "decreases the threshold for dangerous or fatal arrhythmias to occur." Dr. Cline-Parhamovich did not find any alcohol or drugs in the victim's blood or urine. She concluded that the manner of the victim's death was homicide. She also concluded that the victim underwent "a highly emotionally-charged event" and that the victim's death occurred after this "emotional response period." She explained that, in addition to the victim's bad heart, the victim's blunt-force injuries or his restrained position could have caused his death.

On cross-examination, Dr. Cline-Parhamovich agreed that the victim's blunt force injuries alone did not cause the victim's death. She stated that, if the victim had sex in close proximity to his death, the act would have produced a similar "fight-or-flight response" in the victim. Dr. Cline-Parhamovich testified that the victim was not in active heart failure at the time of his death. She stated that an individual on Plavix with senile ecchymosis[3] had "an increased risk of bleeding due to any kind of trauma[.]" However, she stated that, in her professional experience, individuals who take blood thinners like Plavix normally experience more severe bruising than she observed on the victim.

---

[2] Dr. Charles Gano, who died prior to the Defendant's trial, conducted an external and internal examination of the victim's heart. Dr. Gano set out his findings and conclusions in a report, which Dr. Cline-Parhamovich relied on for her conclusions.

[3] Dr. Cline-Parhamovich testified that senile ecchymosis occurs in elderly individuals who have thin skin and incur minor trauma; the traumatized area has a purple or red discoloration.

Melanie Carlisle testified that she worked as special agent forensic scientist and a Violent Crime Response Team leader with the Tennessee Bureau of Investigation ("TBI") at the Knoxville Crime Laboratory. Special Agent Carlisle worked with the Violent Crime Response Team on February 11, 2014, to process the crime scene at the victim's residence. When she arrived, the scene had previously been secured, so Special Agent Christopher Wilhoit walked Special Agent Carlisle through the crime scene. Special Agent Carlisle's team members then began documenting the scene. She stated that "[o]nce the outside was documented, [she] started looking for evidence outside near the back entrance of the house." She observed a firearm in a dresser drawer in the bedroom. Special Agent Carlisle and her team members used a "scanning station" to create a 3-D image of the crime scene; they also recorded videos of the crime scene. She observed that the victim was "laying in front of the TV[]" with his hands tied behind his back with a cord. The victim's feet were bound with a different kind of cord, and the victim was only wearing a shirt and socks. Special Agent Carlisle saw wounds on the right side of the victim's head, right arm, left ribs, knees, and legs. She noted that, when the victim's body was rolled over during the documentation process, a "little white tablet" fell from the victim's hand. Special Agent Carlisle found one house shoe near the victim and a matching house shoe on the porch. She also observed a zebra-print blanket next to the house shoe and the victim. Another agent located a cellular telephone underneath the cushions of the couch in the living room. Special Agent Carlisle found "reddish-brown stains" on the porch of the victim's house that "were presumptively positive for blood." She also documented "mud traces on the floors" that were possibly shoe impressions; however, she was not able to observe much detail from the "traces" to use for comparison analysis at the TBI laboratory. Special Agent Carlisle also found a gold cross pendant on the victim's porch.

On cross-examination, Special Agent Carlisle testified that she observed areas in the victim's house that had "disturbances in [the] dust or [when] there were no disturbances in [the] dust." She explained that:

> except for the living room, the kitchen, and the master bathroom, all of the rooms were dusty including the hardwood floors and any disturbances of the dust on furniture or flooring had another layer of dust, which means if there was a disturbance and something had gotten moved, it had been moved or disturbed prior where it had time to have another layer of dust on top of it.

Special Agent Carlisle observed a baseball bat "at the back living room" of the victim's residence; she did not find a baseball bat near the front door or any sign that one had recently been removed from that area.

Chris Wilhoit testified that, on February 11, 2014, he was a Special Agent with the TBI and that he investigated the victim's death. Special Agent Wilhoit testified that he did not observe a firearm in the victim's residence. He agreed that a firearm would be a "tool of the trade" for an individual who distributed illegal drugs.

Investigator James Randolph testified that he worked for the Greene County Sheriff's Department and that he investigated the victim's death in February 2014. He looked for the victim's cell phone on Jones Bridge Road, where it had last "pinged." He did not locate the cell phone, but he obtained the victim's cell phone records. Investigator Randolph called the phone number that had last been dialed on the victim's phone and spoke with "Mike Smith." Mr. Smith told Investigator Randolph that "Jamie Jamison" had called him from the victim's phone. Investigator Randolph called the number again two hours later, and the same individual answered the phone but stated his name was "Mario." Investigator Randolph asked this individual, who was later determined to be the Defendant, to come to the Greene County Sheriff's Department. The Defendant came to the Sheriff's Department on February 12, 2014. Investigator Randolph informed the Defendant of his *Miranda* rights, and the Defendant gave the following statement:

> Jamie Jamison called and wanted [a] ride . . . from her grandpa's in Camp Creek. I told her no. [Ms. Harris] said Jamie came to the room and [Ms. Harris] took her back to her grandpa's in Camp Creek. [Ms. Harris] said she let Jamie out and she went inside. [Ms. Harris] said she had to go to the bathroom and went inside and came back to the car. [Ms. Harris] called and asked why she was taking so long. Jamie said she had to get his wallet. [Ms. Harris] was blowing the horn and she drove off and left Jamie there. I was at Green Villa Motel when Jamie called me at 12:14 a.m. on February the 11th. [Ms.] Harris was with me in the room. When I went to bed [Ms. Harris] was in the bathroom putting on makeup. When I woke up between 10:00 and 11:00 a.m. [Ms. Harris] was . . . putting on eye shadow and makeup. The battery in my phone went dead after that. I did not take [Ms. Harris] to [the victim's] house in Camp Creek nor do I know [the victim].

The Defendant signed the statement. After the Sheriff's Department interviewed Ms. Harris, Investigator Randolph interviewed the Defendant again, and the Defendant gave the following second statement:

> On February 11th, 2014, me and [Ms.] Harris went to [the victim's] residence at Camp Creek to get some money to buy crack. [Ms. Harris] was driving my car, a gold Cadillac, I was lying in the back seat, and we was supposed to meet him at the service station but he didn't show up. She

was driving when she told me to lay down in the back seat so he couldn't see me. She said if he sees you he won't give me any money. [Ms. Harris] left the car running and went inside and text[ed] my phone and asked if I knew where to buy some crack. I told her you know where to get it. She was in the house a while and I heard her screaming and [the victim] had her down on the back porch. I pushed him off of her back into the living room. I was holding him down on the floor and he was telling us to stop and don't do this. I told [Ms. Harris] to get something to tie him up. [Ms. Harris] came out of the bedroom with a Venetian blind. There was an electric blanket and I cut the cord and wrapped his hands. I used my pocketknife to cut the cord. He was alive when we left. [Ms. Harris] took his pants, cell phone, wallet and took the items to the bridge on Jones Bridge Road. I was driving and [Ms. Harris] got out and threw the items off the bridge. We went back to the motel after that. The stuff was in a plastic bag that she threw in the [r]iver.

The Defendant also signed this statement. Investigator Randolph confiscated a pocketknife from the Defendant after the interview. Investigator Randolph then went to Byrds Bridge to look for items that the Defendant or Ms. Harris had thrown off the bridge. He recovered Ms. Harris' jacket and the victim's insurance card from the river at Byrds Bridge.

Special Agent Kim Lowe testified that she "process[ed] evidence for the presence of biological fluids[]" for the TBI in the forensic biology unit at the Knoxville Crime Laboratory. Special Agent Lowe identified the victim's blood swatch and DNA profile that she used for comparison purposes. Special Agent Lowe also obtained buccal swabs and DNA profiles from Ms. Harris and the Defendant for comparison purposes. Special Agent Lowe tested a zebra-print electric blanket from the victim's residence for human blood and found the victim's blood on the blanket. She also tested swabs from a shoe print found at the crime scene for human blood and found the victim's blood on the swabs. Special Agent Lowe tested swabs from a "reddish-brown stain" on the floor of the victim's residence, and the "partial DNA profile" matched Ms. Harris. She also tested swabs from the victim's porch and found the victim's blood on the swab. Special Agent Lowe tested the ligatures from the victim's wrists and legs, and she found the victim's blood on the "fabric cord[.]" She found a partial DNA profile on the "electrical cord" from at least three people; the victim was the major contributor to the DNA profile, and Ms. Harris and the Defendant were excluded as minor contributors.

Special Agent Lowe also tested six pairs of Nike shoes from the Defendant's residence; her testing of a pair of Nike Air Max shoes presumptively indicated the presence of blood. She was unable to test for human hemoglobin on this pair of shoes

due to a limited sample, but she tested the shoes for DNA. The partial DNA profile from the shoes matched the Defendant. The victim was excluded as a contributor to the DNA profile.

### *The Defendant's Proof*

Special Agent Miranda Gattis testified that she was a forensic scientist with the forensic services division of the TBI; she worked in the trace evidence unit in the Nashville Crime Laboratory. Special Agent Gattis tested numerous pieces of evidence related to this case. She compared the gel impressions taken at the crime scene to various shoes owned by the Defendant; however, none of the shoes matched the gel impression from the victim's residence.

Special Agent Jennifer Spivey testified that she was a forensic scientist in the latent print unit at the TBI Nashville Crime Laboratory. She tested the blinds from the victim's residence, but she was unable to find any fingerprints.

Jerry Moore testified that he had known Ms. Harris since she was nine years old. He stated that Ms. Harris began occasionally asking him for money approximately five years before the offenses. The Greene County Sheriff's Department interviewed Mr. Moore in relation to the current offenses, and he gave a signed statement. However, he clarified that the statement incorrectly mentioned that he had last seen Ms. Harris on February 11, 2014. He testified that he actually saw Ms. Harris on February 10, 2014. On cross-examination, Mr. Moore identified some bank receipts that he gave to a detective during his interview. He agreed that the receipts showed that he had withdrawn money on February 10 and February 11, 2014.

Nicole Dixon testified that she had known the Defendant for seven years and that she was formerly the Defendant's girlfriend. She testified that the Defendant was never violent around her. She stated that, when she and the Defendant began dating, she had recently been diagnosed with stage four breast cancer. The Defendant supported her during her recovery period. The Defendant lost an arm during their relationship, and Ms. Dixon helped the Defendant during his rehabilitation. On cross-examination, Ms. Dixon stated that she was not in a relationship with the Defendant during February 2014.

The jury found the Defendant guilty as charged. The trial court sentenced the Defendant to life for his four convictions of felony murder and ordered sentences of twenty-five years for his especially aggravated robbery and especially aggravated kidnapping convictions. The trial court ordered all the Defendant's sentences to be served concurrently. The trial court denied the Defendant's motion for new trial, and the Defendant now timely appeals the trial court's decision.

## II. Analysis

The Defendant argues that the evidence at trial was insufficient for a rational juror to have found him guilty of felony murder, especially aggravated robbery, and especially aggravated kidnapping beyond a reasonable doubt. He also argues that the State committed prosecutorial misconduct in closing arguments, necessitating a new trial.

### *Sufficiency of the Evidence*

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted), 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

The jury in this case was instructed on criminal responsibility. "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a) (2014). As pertinent here, a person is criminally responsible for the conduct of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2) (2014). Criminal responsibility is not a separate crime but instead a theory by which the State may prove the defendant's guilt based upon another person's conduct. *State v. Osborne*, 251 S.W.3d 1, 16 (Tenn. Crim. App. 2007) (citing *State v. Mickens*, 123 S.W.3d 355, 389-90 (Tenn. Crim. App. 2003)).

"[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). In order to be convicted of the crime, the evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission. *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994); *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988). Mere presence during the commission of a crime is insufficient to support a conviction. *State v. Sherman*, 266 S.W.3d 395, 408 (Tenn. 2008). However, the State need not show that the defendant physically took part in the crime; "encouragement of the principal is sufficient." *Id.*

### Felony Murder

As relevant here, first degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery, burglary, theft, [or] kidnapping[.]" Tenn. Code Ann. § 39-13-202(a)(2) (2014). A conviction for felony murder requires no culpable mental state "except the intent to commit the enumerated offenses[.]" Tenn. Code Ann. § 39-13-202(b) (2014).

> The felony murder rule applies when the killing is done in pursuance of the unlawful act, and not collateral to it. The killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it. The killing may precede, coincide with, or follow the felony and still be considered as occurring in the perpetration of the felony offense, so long as there is a connection in time, place, and continuity of action.

*State v. Rice*, 184 S.W.3d 646, 663 (Tenn. 2006) (internal citations and quotation marks omitted). The intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim, and whether such intent existed is a question of fact to be decided by the jury. *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999). "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." *Id.* at 108.

We will address the Defendant's arguments regarding each count of felony murder in turn.

- 13 -

**Count One - A killing in the perpetration of or attempt to perpetrate a robbery**

The Defendant argues that the State did not offer any proof that he committed a theft and that, if the Defendant or Ms. Harris committed a theft, the theft was "an afterthought in relation to the physical altercation with and restraint of [the victim]." The Defendant further contends that he struck the victim in Ms. Harris' defense.

"Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401 (2014). Relative to defense of a third person, Tennessee Code Annotated section 39-11-612 provides:

> A person is justified in threatening or using force against another to protect a third person, if:
>
> (1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and
>
> (2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

Tenn. Code Ann. § 39-11-612 (2014). A defendant's conduct and mental state must meet an objective standard of reasonableness for the conduct to be justified under this statutory defense. *State v. Bult*, 989 S.W.2d 730, 732 (Tenn. Crim. App. 1998). Thus, the mere fact that a defendant believes that his conduct is justified would not suffice to justify his conduct. *Id.*

It is well-established "that whether an individual acted in [defense of others] is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997) (citing *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993)); *see also State v. Marquette Houston*, No. W2006-00095-CCA-R3-CD, 2007 WL 1890650, at *6 (Tenn. Crim. App. June 29, 2007), *perm. app. denied* (Tenn. Nov. 19, 2007). Moreover, "[t]he State carries the burden of proving that the defendant did not act in [defense of others]." *State v. Sims*, 45 S.W.3d 1, 10 (Tenn. 2001) (citing *State v. Belser*, 945 S.W.2d 776, 782 (Tenn. Crim. App. 1996)). As such, "in the context of judicial review of the jury verdict, in order to prevail, the defendant must show that the evidence relative to justification . . . raises, as a matter of law, a

- 14 -

reasonable doubt as to his conduct being criminal." *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

When the evidence is viewed in the light most favorable to the State, we conclude that there was sufficient evidence for a rational juror to have found the Defendant guilty of felony murder in perpetration of a robbery beyond a reasonable doubt. In addition to the facts set out above that support a conviction of theft, there is ample evidence that the Defendant took the victim's property by violence and put the victim in fear. Ms. Harris testified that the Defendant came onto the victim's porch and struck the victim with a "metal stick[] with a ball on the end of it[,]" which the Defendant carried on his person. The Defendant forced the victim back into the residence and onto the floor, where he continued to hit the victim. The Defendant then tied the victim's wrists and legs together in a "hogtied" position. Additionally, the Defendant admitted in his second statement that "[he] was holding [the victim] down on the floor and [the victim] was telling [the Defendant and Ms. Harris] to stop and don't do this." The victim later died from a heart attack induced from his injuries and the stress of the attack. The Defendant is not entitled to relief on this ground.

The Defendant additionally contends that, "when [he] struck [the victim], he reasonably believed his actions were required to protect [Ms.] Harris, meeting the definition of 'defense of another.'" However, even if the jury credited the Defendant's testimony that he initially struck the victim to defend Ms. Harris, the jury clearly concluded that the Defendant's continued assault on the victim, which resulted in the victim's death, was not in defense of Ms. Harris. *State v. Douglas Canady*, No. M1999-02135-CCA-R3-CD, 2000 WL 1449364, at *2 (Tenn. Crim. App. Sept. 29, 2000), (affirming the defendant's aggravated robbery conviction where the defendant argued he acted in self-defense but "[t]he jury chose to believe the victim, as was the jury's prerogative since it had the responsibility of judging the credibility of the witnesses"), *perm. app. denied* (Tenn. Apr. 16, 2001). The Defendant is not entitled to relief on this ground.

**Count Two - A killing in the perpetration of or attempt to perpetrate a kidnapping**

The Defendant asserts that he tied up the victim to prevent the victim from continuing the altercation between the victim and Ms. Harris. Additionally, the Defendant argues that the victim's injuries and later death did not occur during the kidnapping.

"A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a) (2014). A person is guilty of kidnapping when they

commit false imprisonment "under circumstances exposing the other person to substantial risk of bodily injury." Tenn. Code Ann. § 39-13-303(a) (2014). Tennessee Code Annotated defines bodily injury as "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(2) (2014).

When the evidence is viewed in the light most favorable to the State, we conclude that there was sufficient evidence for a rational juror to find the Defendant guilty of felony murder in the perpetration of a kidnapping beyond a reasonable doubt. Ms. Harris testified that the Defendant came onto the victim's porch, struck the victim, and forced the victim back into the residence. The Defendant then pushed the victim to the living room floor and pinned the victim down by placing his knee on the victim's back. The Defendant instructed Ms. Harris to find something that they could use to tie up the victim; Ms. Harris cut the cord off the blinds in the victim's bedroom. The Defendant used the blind cord and an electrical cord to tie the victim's wrists and legs together in the "hogtied" position. The Defendant and Ms. Harris left the victim's residence while the victim was still tied up and lying on the floor. The victim sustained contusions, abrasions, broken ribs, blunt force injuries, and eventually died from a heart attack from the stress of the offenses.

Regarding the Defendant's argument that he tied up the victim to prevent the victim from continuing the altercation between the victim and Ms. Harris, we note that it was within the prerogative of the jury, as the finders of fact, to reject the Defendant's argument. Further, as previously explained, the evidence introduced at trial was sufficient to rebut the Defendant's assertion that he acted in Ms. Harris' defense. There was ample testimony about the victim's poor health, including his heart condition and poor balance. It was reasonable for a rational juror to reject the Defendant's contention that he needed to strike the victim, force the victim into his residence and onto the floor, continue striking the victim, and tie the victim up in order to protect Ms. Harris from the victim.

**Count Three - A killing in the perpetration of or attempt to perpetrate theft**

The Defendant argues that a reasonable juror could not have found him guilty beyond a reasonable doubt of a killing in the perpetration of theft of property because the victim owed Ms. Harris money in exchange for her attempts at sexual intercourse. Thus, he argues that Ms. Harris did not steal from the victim. He also asserts that "there was no proof that [the Defendant] knew what [Ms.] Harris had done at the time of the altercation with [the victim]." Lastly, the Defendant contends that, if the Defendant took property from the victim when he allegedly went into the victim's bedroom, "there was no proof

that [the Defendant] intended to take anything until after the altercation was complete and [the victim] was restrained."

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a) (2014).

We conclude that there is sufficient evidence for a rational juror to find the Defendant guilty of felony murder in the perpetration of theft beyond a reasonable doubt when the evidence is examined in the light most favorable to the State. Ms. Harris testified that she texted the Defendant twice to inform him that she was going to take money from the victim and leave. After the Defendant struck the victim, pulled the victim into the victim's residence, and pushed the victim onto the floor, the Defendant stated, "What else does the motherf****r got that we can take[?]" This statement evidences the Defendant's intent to steal the victim's property and occurred before the Defendant's criminal acts were completed and before the victim died. Ms. Harris also testified that she took money from the victim and that the Defendant went into the victim's bedroom and left the victim's house with a bag. The Defendant later disposed of "cards and papers and [the victim's] phone[.]" Investigators found the victim's insurance card and Ms. Harris' jacket in the river after Ms. Harris informed law enforcement where she and the Defendant had disposed of the items. This evidence is sufficient to establish that the Defendant formed the intent to take the victim's property while he was attacking and restraining the victim, which later led to the victim's death, and that the Defendant exercised control over the victim's property. He is not entitled to relief on this ground.

**Count Four - A killing in the perpetration of or attempt to perpetrate a burglary**

The Defendant contends that burglary, as instructed by the trial court, only involves entry into "a building other than a habitation" and that there was no proof that he entered "a building other than a habitation." "A person commits burglary who, without the effective consent of the property owner[] . . . [e]nters a building and commits or attempts to commit a felony, theft or assault[.]" Tenn. Code Ann. § 39-14-402(a)(3) (2014). "[N]ot only must the government prove the crime it charges, it must charge the crime it proves." *State v. Goodson*, 77 S.W.3d 240, 244 (Tenn. Crim. App. 2001) (quoting 41 Am. Jur. 2d *Indictments and Informations* § 258 (1995)). Here, the State charged the Defendant with felony murder "in the perpetration of or attempt to perpetrate any burglary[.]"

In *State v. Raymond Lee Swett, Jr.*, No. M2011-00439-CCA-R3-CD, 2013 WL 53993, at *16 (Tenn. Crim. App. Jan. 4, 2013), *perm. app. denied* (Tenn. May 9, 2013), this court addressed the issue of differences between the indictment and the trial court's

instructions to the jury in the context of a constructive amendment of the indictment where the indictment alleged simple burglary as the predicate felony for a felony murder charge and the proof at trial established that the defendant had committed aggravated burglary. This court concluded that the indictment had not been constructively amended "because the instruction on aggravated burglary as the predicate felony did not modify an essential element of the charged crime of felony murder in a manner that permitted the jury to convict the defendant 'on a ground not charged in the indictment[.]'" *Id.* Further, this court concluded that "[t]he felony murder statute applies, in this case, when the defendant committed *'any' burglary*." *Id.* (citing Tenn. Code Ann. § 39-13-202(a)(2)) (emphasis added).

While the Defendant argues that the evidence is insufficient to establish that he committed or attempted to commit simple burglary, which the trial court instructed the jury was the predicate felony for this count of felony murder, the indictment charged the Defendant with committing felony murder based on "any burglary." The evidence established that the Defendant entered the victim's house without the victim's permission and committed or attempted to commit a felony, theft or assault. *See* Tenn. Code Ann. § 39-14-402(a)(3) (2014). As noted above, Ms. Harris testified that the Defendant came onto the victim's porch and began hitting the victim. The Defendant then entered the victim's residence without his permission and forced the victim onto the living room floor. The Defendant continued to strike the victim and later tied the victim's wrists and legs together with an electrical cord and blind cord in a "hogtied" position. Additionally, the Defendant stated, "What else does the motherf****r got that we can take[?]" When the evidence is viewed in the light most favorable to the State, we conclude that a rational juror had sufficient evidence to find the Defendant guilty of felony murder in perpetration of a burglary beyond a reasonable doubt. The Defendant is not entitled to relief on this ground.

### *Count Five - Especially Aggravated Robbery*

The Defendant contends that Ms. Harris' testimony that the Defendant struck the victim with a metal "stick" that extended was insufficient evidence of a deadly weapon to establish his guilt of especially aggravated robbery. Additionally, he asserts that the State failed to establish that the victim suffered serious bodily injury because the victim mainly sustained contusions, abrasions, and two broken ribs.

An individual commits especially aggravated robbery when he commits robbery, as defined above, accomplished with a deadly weapon and when the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-403(a) (2014). A deadly weapon is "[a] firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury" or "[a]nything that in the manner of its use or intended use

is capable of causing death or serious bodily injury[.]" Tenn. Code Ann. § 39-11-106(a)(5) (2014). Tennessee Code Annotated defines serious bodily injury as a bodily injury that involves "[a] substantial risk of death[,]" "[p]rotracted unconsciousness[,]" "[e]xtreme physical pain[,]" "[p]rotracted or obvious disfigurement[,]" or "[p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(34)(A)-(E) (2014).

When the evidence is viewed in the light most favorable to the State, we conclude that the evidence is sufficient for a rational juror to find the Defendant guilty of especially aggravated robbery beyond a reasonable doubt. As we have previously noted, Ms. Harris testified that the Defendant came onto the victim's porch and began hitting the victim with an object that she described as a "metal stick[] with a ball on the end of it" that extended. The Defendant then entered the victim's home without his permission while forcing the victim onto the living room floor. The Defendant tied the victim's wrists and legs with an electrical cord and blind cord while he kneeled on the victim's back. As a result of the Defendant's offenses, the victim suffered blunt force injuries, bruises, abrasions, broken ribs, internal bleeding, and eventually died from a stress heart attack. It was within in the jury's prerogative to find that the metal stick that the Defendant carried was a deadly weapon. It was also within the jury's prerogative to find that the victim sustained serious bodily injury based on Dr. Cline-Parhamovich's testimony, and we will not reweigh the evidence. The Defendant is not entitled to relief on this ground.

### Count Six - Especially Aggravated Kidnapping

As to this conviction, the Defendant contends that "the State failed to establish a kidnapping of any variety, . . . and failed to show there was a serious bodily injury."

As relevant here, especially aggravated kidnapping is false imprisonment, as defined above, "[w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-305(a)(4) (2014). We have previously set out the definition of serious bodily injury.

When the evidence is viewed in the light most favorable to the State, we conclude that there was sufficient evidence for a rational juror to find the Defendant guilty of especially aggravated kidnapping beyond a reasonable doubt. As we have previously noted, Ms. Harris testified that the Defendant came onto the victim's porch, struck the victim, and forced the victim back into the residence. The Defendant then pushed the victim to the living room floor and pinned the victim down by placing his knee on the victim's back. The Defendant instructed Ms. Harris to find something that they could use to tie up the victim; Ms. Harris cut the cord off the blinds in the victim's bedroom. The Defendant used the blind cord and an electrical cord to tie the victim's wrists and legs

together in the "hogtied" position. The Defendant and Ms. Harris left the victim's residence while the victim was still tied up and lying on the floor. The victim sustained contusions, abrasions, broken ribs, blunt force injuries, and eventually died from a heart attack from the stress of the offenses. As we have also discussed, it was within the purview of the jury to find that the victim suffered serious bodily injury. The Defendant is not entitled to relief on this ground.

*Prosecutorial Misconduct*

The trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of discretion. *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001). Closing argument by a prosecutor "is a valuable privilege that should not be unduly restricted." *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001). That said, Tennessee courts have recognized numerous prosecutorial arguments as improper. It is improper for a prosecutor to engage in derogatory remarks, appeal to the prejudice of the jury, misstate the evidence, or make arguments not reasonably based on the evidence. *State v. Banks*, 271 S.W.3d 90, 131 (Tenn. 2008).

In *State v. Goltz*, this court listed "five general areas of prosecutorial misconduct" that can arise during closing argument:

(1) intentionally misleading or misstating the evidence;

(2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt;

(3) making statements calculated to inflame the passions or prejudices of the jury;

(4) injecting broader issues than the guilt or innocence of the accused; and

(5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

"In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996). In *Judge v. State*, 539 S.W.2d 340 (Tenn. Crim. App. 1976), this court listed the following factors to be considered when determining whether the

improper conduct of a prosecutor affected the verdict to the prejudice of the defendant: (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case. *Id.* at 344.

In this case, the Defendant failed to object to any of the statements that he argues constitute prosecutorial misconduct. Rule 36(a) of the Tennessee Rules of Appellate Procedure states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." "The failure to make a contemporaneous objection constituted waiver of the issue on appeal." *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). Accordingly, we conclude that the Defendant waived plenary review of this issue by failing to raise contemporaneous objections.

However, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. *State v. Hatcher*, 310 S.W.3d 788, 808 (Tenn. 2010). Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *State v. Adkisson*, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." *Adkisson*, 899 S.W.2d at 640–41; *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the *Adkisson* standard for plain error relief). When it is clear from the record that at least one of the factors cannot be established, this court need not consider the remaining factors. *Smith*, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

We will address the Defendant's arguments relating to each of the prosecutor's statements individually, as the statements occurred in closing arguments.

Members of the Jury, when you go back there, excuse me, think about how momma or daddy, or grandma or grandpa, whoever that person was in your life that taught you that actions have consequences. That I didn't mean to is not a good enough answer. Think about how hollow that answer is when you're talking about hitting a one-eyed old man in the head with a club, and then tying him up and ransacking his home, taking his belongings. The man wasn't rich. That place he was living in, it wasn't even his place. Do you think saying, "He was alive when I left him," do you think that would be good enough for momma or daddy, or mamaw or papaw, or whoever?

The Defendant contends that the prosecutor's statement, asking the jurors to consider how their family members would react to the offenses, was calculated to inflame the passions or prejudices of the jury and improperly asked the jurors to place themselves in the victim's shoes, an impermissible "golden rule" argument. In *State v. Randy Anthony Sanders*, the prosecutor made the following statement during closing argument:

By the way, if when you go out to the parking lot, after you've rendered your verdict, and your car is gone, and a day later you get a call that it's in Memphis, and you have to go get it, and your GPS is missing from it, I want you to ask yourself: Did he steal my car . . . or is he just joyriding?

No. M2014-02535-CCA-R3-CD, 2015 WL 5461660, at *6 (Tenn. Crim. App. Sept. 18, 2015), *perm. app. denied* (Tenn. Jan. 19, 2016). This court defined the "golden rule" argument as asking the jury to "place themselves in the position of a party to the cause, or posing to them the question whether they would go through life in the condition of the injured [victim], or would want members of their family to go through life [physically disabled] . . . ." *Id.* (quoting *Esmail Ashdji and Faizeh Ashdji v. Rodney E. Yardley*, CA No. 1188, 1988 WL 116498, at *2 (Tenn. Ct. App. Nov. 4, 1988)) (second alteration in original). This court concluded that the State's closing argument was a response to the defendant's argument "that he was only guilty of joyriding" and "was not so improper or inflammatory as to amount to prosecutorial misconduct." *Id.*

Here, we conclude that, like the State's argument in *Randy Anthony Sanders*, the State's argument was a response to the Defendant's statement to law enforcement that "[the victim] was alive when [the Defendant and Ms. Harris] left." Further, the State's comment asking the jury to consider whether the Defendant's statement that the victim was alive when the Defendant and Ms. Harris left the victim's house would appease their family members asks the jurors to place themselves in the Defendant's circumstance, not

- 22 -

the victim's circumstance. Therefore, the Defendant has not established that this statement breached "a clear and unequivocal rule of law," and he is not entitled to relief on this ground. *See Adkisson*, 899 S.W.2d at 640–41.

### *Statement (2)*

> These counts of felony murder -- when this defendant got to the porch and struck Donald Gunter with that club, did he stop and grab her and run? No. He drug him back into his home and put him on the floor. What else does this gentlemen g[e]t? He tied him -- hog-tied him. Tied him up like an animal, like he would a calf, hog-tied him. Started taking his stuff. Donald Gunter had already tried to take his money back. The only way he was getting what he got was the way he did, by violence and by force. I don't know if any of you have ever seen or used one of those [batons], those that extend. They're heavy. Think about getting hit on the side of the head with one of those and you're healthy. I hope he didn't see it coming, but we know he felt it because he looked up and asked why. I'm sorry that we don't have that asp, that club to show you. The people who commit these crimes don't make it -- don't always make them easy to solve. You want to see an asp, look at 207. I'll show you . . . an asp. Or 227. I'm sorry. Look at that cylindrical bruise right above that tag. If you want to see an asp, there's your asp.

The Defendant asserts that the State intentionally argued facts outside the record and misstated evidence when the prosecutor described the Defendant's weapon as an "asp" and "club" that was "heavy" because Ms. Harris referred to the weapon as a "stick." Additionally, the Defendant contends that the above statement is another example of an improper "golden rule" argument that asked the jury to place themselves in the victim's shoes and was calculated to inflame the passions or prejudices of the jury. We conclude that, based on Ms. Harris' description of the Defendant's weapon as a "stick" that "clicks" when it "extends," the State's reference to the weapon as a "heavy" "asp" or "baton" was a reasonable inference based on the testimony at trial. *See Randy Anthony Sanders*, 2015 WL 5461660, at *7 (State's closing argument that allegedly argued facts outside record was not plain error because "[t]he argument was based on inferences drawn from the evidence presented at trial"). We also conclude that the State's comment asking the jury to "[t]hink about getting hit on the side of the head with one of those and you're healthy" was not likely calculated to inflame the passions or prejudices of the jury. Like the comment in *Randy Anthony Sanders*, the State's comment was a response to the Defendant's argument that the victim was in poor health and that the Defendant did not cause his death. Therefore, the Defendant has not established that the State's comment breached a "clear and unequivocal rule of law[.]"

*See Adkisson*, 899 S.W.2d at 640–41. He is not entitled to plain error relief on this ground.

### Statement (3)

> You want to let someone say Donald Gunter was a pill-pusher. Well, maybe he was. But on that February night he wasn't the godfather of pill trafficking. He was an old man alone at home minding his own business. They went to him. He went to him. . . . [Y]ou know what Donald Gunter was worried about on that night? Let me say this, if he was selling pills, if he was trading pills, the [S]tate cannot, will not condone that, but we didn't find stockpiles of pills that you would expect to find if he was a big-time drug dealer. All we found was him lying in the floor with . . . bad health and one eye sewn shut, naked, or at least naked from the waist down. How much more vulnerable can a man be? What we did find was exactly as Amanda Harris testified to. All the way down to the Pepsi on the counter. Remember -- look at the pictures.

The Defendant argues that the State intentionally argued facts outside the record and misstated evidence in the above statement because "none of the law enforcement witnesses testified that there was no stockpile of pills at [the victim's] house[,]" and Ms. Morgan testified that the victim stored his pain medication at his daughter's house. During the Defendant's cross-examination of Ms. Morgan, she denied that the victim was a "kingpin at drugs" and asserted that the victim worked and owned a trailer park to support himself and his family. However, she admitted that the victim "did sell drugs, the pain pills, . . . every now and then[.]" The State's argument that law enforcement "didn't find stockpiles of pills that you would expect to find if he was a big-time drug dealer" is a fair inference based on Ms. Morgan's testimony and the evidence found at the scene of the offenses. *See Randy Anthony Sanders*, 2015 WL 5461660, at *7. We conclude that the State did not intentionally misstate evidence or argue facts outside of the record. Therefore, the Defendant has not established that the State's comment breached a "clear and unequivocal rule of law[.]" *See Adkisson*, 899 S.W.2d at 640–41. He is not entitled to plain error relief on this ground.

### Statement (4)

> Yes, the man had a weak heart. At some point, if we live long enough, we're all going to be in that position, something is going to be weak on us. And it wasn't just his heart. I'll tell you what was weaker than that. It was his ability . . . to tell that young girl that was out here no. And I guess I should say it this way, this ain't [sic] easy to talk about, sometimes life is

- 24 -

just not easy to talk about it. His heart . . . was weak but he still had a desire to be a man.

The Defendant contends that the above statement included an impermissible "golden rule" argument that was calculated to inflame the passions or prejudices of the jury. In *State v. Jessie Dotson*, No. W2011-00815-CCA-R3-DD, 2013 WL 4728679, at *77 (Tenn. Crim. App. June 25, 2013) (citing *State v. Odom*, 336 S.W.3d 541, 562 (Tenn. 2011)), the prosecutor allegedly "encouraged the jury to experience the victims' fear during rebuttal argument in the penalty phase." This court concluded that the State's remarks were proper because "[t]he prosecutor's references to the fear that the victims must have felt related to the 'nature and circumstances' of the offenses and, therefore, were proper." *Id.* (citing *State v. Odom*, 336 S.W.3d 541, 562 (Tenn. 2011)). Similarly, we conclude that the State's above remarks were proper and not calculated to inflame the passions and prejudices of the jury because they related to the serious bodily injury sustained by the victim—an essential element of several of the Defendant's convictions. The Defendant has not established that the State's comment breached a "clear and unequivocal rule of law[.]" *See Adkisson*, 899 S.W.2d at 640–41. He is not entitled to plain error relief on this ground.

### Statement (5)

This is where I always wanted to stand. When I was in the 8th grade I made up my mind I wanted to be a lawyer. And this is where I wanted to stand. I have found it's not what it looks like on television. Can't sleep. Last night I called my family and told them I was coming home, actually called my wife. Didn't expect anybody to be there but her, but in the background I heard children. Oh, no, the grandchildren are there. 7, 5, 3 and 1. I have got to work. Open up the door and try to sneek up and hear one of them say, ["]There's Dada["] and hear feet coming up the steps.

The Defendant argues that, in this statement, the State argued facts outside of the record and intended to inflame the passions or prejudices of the jury. In *State v. Scarborough*, 300 S.W.3d 717, 731 (Tenn. Crim. App. 2009), the defendant argued that the prosecutor argued facts outside of the record, in part by stating that "the birth of his child was a life-defining moment and that the jurors have had their own life-defining moments[.]" This court concluded that the statements were not plain error because "none of the statements 'probably changed the outcome of the trial[.]'" *Id.* at 732 (quoting *Adkisson*, 899 S.W.2d at 642). Similarly, we conclude that, while the prosecutor introduced superfluous facts about his family into his closing argument, we conclude that, when the improper statement is "viewed in context and in light of the facts and circumstances of the case[,]" the statement does not rise to the level of plain error. *See*

*Judge*, 539 S.W.2d at 344. The Defendant did not object to the statement during trial, and we cannot exclude the possibility that the Defendant waived his objection for tactical reasons. *See Adkisson*, 899 S.W.2d at 640–41. Additionally, consideration of the error is not "necessary to do substantial justice" because the improper comment was not repeated throughout the State's closing arguments and the weight of the evidence against the Defendant was strong. The Defendant is not entitled to plain error relief on this ground.

### *Statement (6)*

> I never thought I'd stand in a courtroom and hear where a person being attacked because he's fighting for life. He had no lawyers in that home to defend him. Very talented and gifted. He had no judge to call balls or strikes. He's laying there fighting for his life.

The Defendant argues that the State intentionally inflamed the passions or prejudices of the jury with this statement. In *State v. Bigbee*, 885 S.W.2d 797, 810 (Tenn. 1994), the State made the following remark during closing argument:

> I anticipate in a few minutes the defense will ask for mercy for the life of Roosevelt Bigbee. . . . There was nobody there on January 9th 1990, to ask for mercy for Vada Langston, none of her children, none of her family. Nobody was there when she was shot the first time to ask for mercy for her life. There was nobody there from her family to ask for mercy when she was shot the second time. Nobody to ask for mercy for her.

The Tennessee Supreme Court concluded that, in this statement and other similar statements, "the prosecutor strayed beyond the bounds of acceptable argument by making a thinly veiled appeal to vengeance, reminding the jury that there had been no one there to ask for mercy for the victims . . . , and encouraging the jury to give the defendant the same consideration that he had given his victims." *Id.* at 812. The supreme court concluded that "[t]hough each of the errors discussed above might have been harmless standing alone, . . . considered cumulatively, the improper prosecutorial argument and the admission of irrelevant evidence affected the jury's sentencing determination to the defendant's prejudice." *Id.* Therefore, the supreme court reversed the defendant's death sentence and remanded for a new sentencing hearing. *Id.*

Here, we conclude that the State's remarks in the current case do not rise to the level of impropriety shown in *Bigbee*. *See id.* at 810. While the State's remark could be construed as "a thinly veiled appeal to vengeance," the prosecutor did not continue to comment on the victim's lack of defense against Ms. Harris' and the Defendant's actions. The Defendant has not established that the State's comment breached a "clear and

unequivocal rule of law[.]" *See Adkisson*, 899 S.W.2d at 640–41. He is not entitled to plain error relief on this ground.

## *Statement (7)*

The man with no life left in him, the proof is, had been to the casino two nights before. The man with no life in him actually had been to a club meeting that night. That's before he came to see his girlfriend Tina. The man seems to have some life left. Go back and look at the pictures. There's a fishing pole in the pictures. Look at pictures. There is a four-wheeler in the pictures. I know it's small but there is a Pepsi in the refrigerator and a big TV and an electric blanket that he loved . . . to cover himself up with. There is a helmet. In the pictures with the blinds missing, look over there in the corner, there is a helmet. And you say, Mr. Mills, I don't believe that guy was riding anything. You know, I told you about grandchildren? That grandson he loves, that's the reason why I told that. Life is about little things. About knowing people. You remember when Tina Morgan was looking at the life pictures that the defense put up for us showing Donald Gunter going down? She kept staring at the pictures. Do you remember what she kept saying? She kept looking for family in them. It was strange. She's right. It was strange. They're cut out. They are cut off. The man had family and he was enjoying life with family and they were enjoying life with him. And because of the action of Amanda Harris and this defendant, just like the pictures, it was cut off. He wasn't only robbed of his pants. Do you think that was taken in the defense of others, his pants? Do you think his cell phone was taken in the defense of others? Oops! We've got a phone. That was in the defense of others? Ladies and Gentlemen, I just want t[o] say that he was alive. It may not have been what you and I think of [but] he was alive. Maybe he wasn't all he should be, and maybe his health wasn't all it could be, but as a great prosecutor once said long before me, ["]At least he was.["] And when these two left he was not.

The Defendant argues that the statement that the victim "had family and he was enjoying life with family and they were enjoying life with him" was calculated to inflame the passions or prejudices of the jury and that the State intentionally misled the jury by arguing that the Defendant cut the victim's family out of photographs admitted as exhibits. The Defendant notes that, "[a]t the motion for new trial, the State conceded the pictures had been redacted by order of the trial court."

- 27 -

In the case sub judice, we conclude that the statements do not rise to the level of prosecutorial misconduct. The jury heard testimony from Ms. Morgan that the victim interacted with his family members; therefore, the State's comment that the victim "had family and he was enjoying life with family and they were enjoying life with him" was a fair inference based on the evidence presented at trial. The State commented that the victim's family members were "cut out" and were "cut off." The State then commented that the victim's life was "cut off" by Ms. Harris and the Defendant. We conclude that the State referred to Ms. Morgan's testimony and did not improperly claim that defense counsel altered the photographs. We also note that the trial court instructed the jury that "[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence."

The Defendant also argues that the prosecutor's statements consisted of impermissible victim impact argument. However, the Defendant has failed to support this final argument with any citation to applicable case law. Accordingly, we conclude that the argument is waived. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court.").

Because the Defendant has not established that the State's conduct breached a clear and unequivocal rule of law, *see Adkisson*, 899 S.W.2d at 640–41, he is not entitled to plain error relief.

### *Comment on right not to testify*

The Defendant additionally argues that the State impermissibly commented on his right not to testify in two statements. We will address each statement individually.

Both the United States Constitution and the Tennessee Constitution "guarantee criminal defendants the right to remain silent and the right not to testify at trial." *State v. Jackson*, 444 S.W.3d 554, 585 (Tenn. 2014). The Tennessee Supreme Court has previously cautioned that "[t]he subject of a defendant's right not to testify should be considered off limits to any conscientious prosecutor." *Id.* at 586 (quoting *State v. Hale*, 672 S.W.2d 201, 203 (Tenn. 1984)) (internal quotation marks omitted). In addition to direct comments on a defendant's decision not to testify, "indirect references on the failure to testify also can violate the Fifth Amendment privilege." *Id.* at 587 (quoting *Byrd v. Collins*, 209 F.3d 486, 533 (6th Cir. 2000)) (internal quotation marks omitted).

In *Jackson*, our supreme court adopted a two-part test for determining whether a prosecutor's remark amounts to an improper comment on a defendant's constitutional right to remain silent and not testify. *Id.* at 587–88. The two-part test analyzes: "(1)

whether the prosecutor's manifest intent was to comment on the defendant's right not to testify; or (2) whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on the defendant's failure to testify." *Id.* at 588. This court reviews a defendant's claim of impermissible prosecutorial comment on the right not to testify de novo. *Id.* If a prosecutor's remark is non-structural constitutional error, this court will then determine whether the error is harmless. *Id.* at 590–92. The Tennessee Supreme Court has considered the following factors in its harmless error analysis: "the nature and extensiveness of the prosecutor's argument, the curative instructions given, if any, and the strength of the evidence of guilt." *Id.* at 591–92.

### *Statement (1)*

> This defendant said in his statement that she took it. She testified he took it. If you look at the evidence that -- look at the medicine in the man's eye. You can see it in the photographs. Look at the crime scene. It all lines up with her testimony. You think she wanted to have to come out here and get up there and admit to what she was . . . having to do with that man to get that money. You think she's the one that bashed his head. She had been out there before and never had a problem with him. Her mistake was taking him with her. And now she's got 25 years to think about it. Some may criticize the [S]tate for giving her a deal. She got a deal if 25 years is a deal. I take full responsibility for that. He didn't do it. I did. I take the blame for that, if there is blame. If you are going to find blame in that, that's me. And do you want to know why? There w[ere] only two people that knew what happened that evening. Donald Gunter and his family deserved to know what happened, deserved some sense of justice. There w[ere] only two people that could tell us. Sometimes you have to choose between the lesser of two things.

In *Jackson*, our supreme court noted that "a prosecutor's comments on the absence of any contradicting evidence may be viewed as an improper comment on a defendant's exercise of the right not to testify when the defendant is the only person who could offer the contradictory proof." *Id.* at 586 n.45. We conclude that the above statement was an indirect reference to the Defendant's right to decline to testify. The State's comment implies that the Defendant was the other individual, beside Ms. Harris, who could have told the victim's family about the offenses. When viewed in the context of the State's closing argument, this remark is "of such a character that the jury would necessarily taken it to be a comment on the [D]efendant's failure to testify." *Id.* at 588; *see also State v. Colvett*, 481 S.W.3d 172, 208 (Tenn. Crim. App. 2014) (concluding that the prosecutor's statement in closing argument that the State did not know how long the

- 29 -

defendant had been at the crime scene because the State did not "have any proof" and had "nobody to talk to" was an indirect comment on the defendant's failure to testify). Therefore, we will determine whether this non-structural constitutional error was harmless.

We note that this remark occurred in the State's initial closing, and the Defendant had the ability to respond to the State's comment in closing. Unlike the prosecutor in *Jackson*, who, during the State's rebuttal argument, "walked across the court room, stood in front of [the d]efendant, gestured toward her, and demanded in a loud voice, 'Just tell us where you were! That's all we are asking, Noura[,]'" there is no evidence that the prosecutor used a loud tone or used body language to imply that he was referring to the Defendant. *See Jackson*, 444 S.W.3d at 589. This remark was also an isolated incident in the State's closing. Additionally, the Defendant did not object to the prosecutor's comment or request an instruction. The trial court did not issue an instruction relating to this remark, which would have highlighted its improper nature. However, the trial court gave the following instruction to the jury: "Statements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them." Further, we note that the evidence introduced at trial fully supports the Defendant's convictions. We conclude that the State's error in indirectly commenting on the Defendant's right against self-incrimination was harmless. *See Colvett*, 481 S.W.3d at 208–09.

### *Statement (2)*

> You may not think that Donald Gunter had long to live. What was it these very distinguished attorneys pointed out on cross? They showed two pictures of Donald Gunter and said, looks like he's going down. Put up another picture. It looks like he's going down. Like there was no value of life left in the man. That was the implication. They're not going to say that out loud. They know what you would do. But the implication is, oops, this was just an accident. Let this man go. You got one. She's got 25 years. That's enough. Send everybody home.

We conclude that this statement clearly refers to the Defendant's cross-examination of Ms. Morgan and is not a comment on the Defendant's right not to testify. During the Defendant's cross-examination of Ms. Morgan, she testified about the victim's health issues, and she identified personal photographs of the victim. Thus, it was not the prosecutor's "manifest intent" to "comment on the defendant's right not to testify[.]" *Jackson*, 444 S.W.3d. at 588. We also conclude that the remark was not "of such a character that the jury would necessarily have taken it to be a comment on the

- 30 -

[D]efendant's failure to testify." *Id.* The Defendant is not entitled to relief on this ground.

### *Comment on right to counsel*

Lastly, the Defendant asserts that the State commented on his Sixth Amendment right to counsel by stating that the victim "had no lawyers in that home to defend him" during the offenses.

"A violation of defendant's right to counsel occurs when a prosecutor's . . . argument seeks to penalize the defendant for exercising his constitutional right." *State v. Hines*, 919 S.W.2d 573, 580 (Tenn. 1995) (citing *United States v. McDonald*, 620 F.2d 559, 562-564 (5th Cir. 1980)). In *State v. William Paul Eblen*, the State made the following comment during closing argument:

> When [Officer] Vineyard first got up to [the Defendant's] place the next day, we have heard on and on and on about what a cooperative sort [the Defendant] has been. Of course, then we find out here just about half an hour ago that this man, who is trying to convince you that he just has consensual sex with [C.P.] some twelve hours before, *when this officer gets up there to talk to him, what does he do? He wants to talk to a lawyer.*

No. E2002-01221-CCA-R3-CD, 2003 WL 22225636, at *7 (Tenn. Crim. App. Sept. 26, 2003), *perm. app. denied* (Tenn. Mar. 8, 2004) (italics and alterations in original). On appeal, the defendant argued that this statement was "an impermissible comment" on his exercise of his right to counsel; however, because the defendant failed to make a contemporaneous objection, this court reviewed the statement for plain error. *Id.* This court concluded that a clear and unequivocal rule of law had been breached and that a substantial right of the defendant was affected because the State "specifically referred to the Defendant's invocation of his constitutional right to counsel during questioning by the police[]" "in order to cast doubt on the [d]efendant's theory that his intercourse with the victim was consensual, and to cast doubt on his posture of cooperation with the police." *Id.* at *8. However, this court concluded that the State's prosecutorial misconduct was harmless beyond a reasonable doubt because "[t]he jury did not convict the [d]efendant because he wanted to speak to a lawyer; it convicted the [d]efendant because the proof of his guilt was overwhelming." *Id.*

We conclude that the State's comment that the victim "had no lawyers in that home to defend him" during the offenses was not a specific reference to the Defendant's right to counsel under the Sixth Amendment. In contrast to the statement in *William Paul Eblen*, where the prosecutor explicitly mentioned the defendant's request for

representation, here, the State's comment implies that the victim was literally and figuratively defenseless during the offenses. The Defendant is not entitled to plain error relief on this ground.

*Cumulative Error*

Lastly, the Defendant argues that in each of the above statements from the State's closing arguments, "the State also attempted to 'divert the jury from its duty to decide the case on the evidence.'" He argues that "[i]n light of the relative weakness of the State's [] case as described herein above, the cumulative effect of these repeated improper and inflammatory statements by the State in its closing argument constitutes reversible error."

The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great at to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id.* at 77. We have determined that the prosecutor improperly introduced facts outside the record by discussing the impact of the trial on his family, and he indirectly referred to the Defendant's failure to testify by suggesting that the State offered a plea bargain to Ms. Harris because only she and the Defendant could tell the victim's family what happened to the victim. However, we have concluded that the Defendant is not entitled to relief from either of these errors because the errors were not pervasive in the State's closing argument and did not prejudice the Defendant's case. Therefore, we determine that the Defendant is also not entitled to relief from cumulative error because the errors do not have a cumulative effect that requires reversal to preserve the Defendant's right to a fair trial.

*Merger of convictions*

It appears from the record that the trial court failed to properly merge the Defendant's four convictions for felony murder into a single conviction. *See State v. Berry*, 503 S.W.3d 360, 362 (Tenn. 2015) ("Merger . . . is required when a jury returns guilty verdicts on two counts that represent alternative theories of the same offense."). Therefore, we remand the case for entry of amended judgments and order the trial court to merge counts two, three, and four into count one.

### III. Conclusion

Based on the aforementioned reasons, we affirm the Defendant's convictions. We remand the case for entry of amended judgments merging counts two, three, and four into count one.

_____
ROBERT L. HOLLOWAY, JR., JUDGE